IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JIMMIE McCALL,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>SOFT-LITE, LLC,<br><br>　　　　　　　Defendant. | CASE NO. 5:22-CV-00816-SL<br><br>JUDGE SARA LIOI<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION, EXPEDITED OPT-IN DISCOVERY, AND COURT-SUPERVISED NOTICE TO POTENTIAL OPT-IN PLAINTIFFS** |

I. **INTRODUCTION**

Lenient does not mean automatic. Defendant does not disagree that the Sixth Circuit has noted that the "fairly lenient standard" under Section 16(b) of the Fair Labor Standards Act, 29 U.SC. § 216(b) ("FLSA"), often results in conditional certification of a notice class. *See White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012), *quoting Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). However, the lenient standard is not a rubber-stamp standard as the plaintiffs in this case purport it to be, and the Sixth Circuit is currently considering what the standard should be.

Plaintiff Jimmie McCall ("McCall") worked for defendant Soft-Lite LLC ("Soft-Lite") for approximately two years, beginning during the height of the COVID-19 pandemic in June 2020, until his termination earlier this year. He and three opt-ins (collectively the "plaintiffs") under Section 16(b) allege that Soft-Lite unlawfully failed to pay them for time spent changing in and out of personal protective equipment ("PPE"), receiving work instructions and/or attending meetings, walking to their assigned work areas, and/or performing work off-the-clock. Based on a pair of declarations—one from McCall himself and the other from his wife—plaintiff seeks to represent a class comprised of more than 500 manufacturing employees.

This Court should deny the plaintiffs' motion. At its core, the motion reflects a mistaken view that the standard for conditional certification is no higher than the standard for notice pleading. That is incorrect. Moreover, even if plaintiffs' allegations were true (which they are not), the claims would not support conditional certification of the proposed notice class. The plaintiffs premise their motion solely upon a handful of conclusory allegations contained in their Complaint and mimicked in cookie-cutter declarations.

Noticeably absent is the identity of a single manager or supervisor who required any specific plaintiff—let alone a class of <u>every</u> manufacturing production worker at Soft-Lite—to

attend meetings off the clock or perform manufacturing work off-the-clock. Indeed, plaintiffs curiously omit any description of their actual day-to-day responsibilities, a cursory review of which reveals that McCall works at the *end* of an assembly line. As a result, for him to perform any work off-the-clock, he would need individuals present at every preceding station to feed materials to him. This did not happen.

It is unsurprising that plaintiff omits any actual description of the PPE he wore, as the amount of time it would take to don it was mere seconds. It is also unsurprising that plaintiff offers no description of the distance between the time clock and his workstation, particularly given that he can punch in as he is *en route* from the employee parking lot to the facility floor. If this Court were to grant conditional certification, this case would devolve into a mire of individualized mini-trials—not only for <u>each manufacturing employee at the facility</u>, but also for <u>each week,</u> and even <u>each day</u>. This certainly is not the function meant to be served by the FLSA's collective action procedures.

## II. STATEMENT OF FACTS

### A. The Parties and Three Opt-Ins.

Defendant Soft-Lite manufactures replacement windows and doors. *See* Declaration of Rachel Boland ("Boland Dec.") at ¶ 2, attached as Exhibit 1. Plaintiff Jimmie McCall worked at its facility in Streetsboro, Ohio. (*Id.* ¶ 1.) Excluding maintenance workers or temps, Soft-Lite employs approximately 218 production workers at this time. (*Id.* ¶ 2.)

McCall was hired in June 2020 as a MP1 (the entry level MP) Frame Corner Cleaner. (Boland Dec. ¶ 3.) McCall spent several months in that role until he was promoted to a MP2 and moved to the Tunnel Wrapper station. (*Id.*) He remained in that role until he suffered a work-related injury and was moved to light duty. He left the company in June 2022. (*Id.*) McCall had a lengthy history of discipline and timeliness issues with the company. Among his numerous infractions, he was caught selling t-shirts in the facility before and during working hours.

Similarly, in June 2021, he was disciplined for bring a cooler to work and selling homemade smoothies while on the production floor during working time. (*Id.* ¶ 4.) McCall resigned his employment on June 1, 2022, approximately two weeks after filing this lawsuit. (*Id*. ¶ 3.)

Opt-In plaintiff Katrina Deal-McCall is Jimmie McCall's wife. (Boland Dec. ¶ 5.) Ms. Deal-McCall started work as a full-time employee at Soft-Lite on May 16, 2022, and worked as a window balancer and sill punch operator on the 12/20 Line. (*Id*.) She submitted an opt-in consent on the date this lawsuit commenced but elected not to join as a named plaintiff. She resigned from Soft-Lite with her husband on June 1, 2022. (*Id.*)

Opt-in plaintiff Tonya McDonald worked as a saw operator for Soft-Lite from May 3, 2021, until June 10, 2022. McDonald suffered from frequent attendance issues while she worked for the company and ultimately resigned without explanation. She joined this lawsuit in October 2022, more than four months after she left Soft-Lite. (Boland Dec. ¶ 6.)

Finally, opt-in Brandon Boyd was hired in June 2017 and spent most of his career as a Vertical Wrapper on the line adjacent to plaintiff McCall. (Boland Dec. ¶ 7.) Boyd was a problematic and written up numerous times for using his phone on the production floor, as well as for attendance, performance, and conduct. (*Id.* ¶ 7.) Despite being friends with plaintiff McCall, he did not join the lawsuit until November 2, 2022—six months after the Complaint was filed— and not coincidentally the day <u>after</u> Boyd was terminated for conduct. (*Id.*)

    **B.**  **Soft-Lite's Facility Functions as a Team.**

Soft-Lite runs multiple lines of product and spreads the work over several departments. There are five major production lines and several supporting departments. For example, there is a Casement line, the "1220 line" the "7 line," and the Barcelona. There is also a department specifically for patio doors, as well as a painting department. Each line has 15 to 35 individuals working on it and each supporting department has from 1 to 8 employees. Skill levels required for the specific stations on the line vary by department. (Boland Dec. ¶ 8.)

Soft-Lite operates two nine-hour shifts: first shift commences at 6:00 a.m. and lasts until 3:30 p.m. Second shift begins at 5:00 p.m. and lasts until 2:30 a.m. (Boland Dec. ¶ 9.) Prior to November 7, 2022, and for the past three years including when McCall was hired, Soft-Lite ran two ten-hour shifts. Both the first and second shifts under that arrangement still commenced at 6:00 a.m. and 5:00 p.m. (*Id.*)

### C. Soft-Lite Requires Very Little Employee Personal Protective Equipment and Only for the Safety of its Employees.

Soft-Lite requires only minimal PPE. All employees on the production floor must wear: 1) ear plugs; 2) safety glasses; 3) steel-toed shoes when the individual is no longer in the central aisle where the timeclocks are located. (Boland Dec. ¶ 10.) The earplugs and safety glasses are provided by Soft-Lite and available at dispensers near the employee entrance. (*Id.*) During the pandemic, pursuant to local or state regulations, all employees were required to wear masks to prevent the potential spread of COVID-19. Aside from that specific time, employees are not required to wear masks on the production floor. (*Id.* ¶ 11.) A picture of the glasses and ear plugs is attached as Exhibit A to the Declaration of Rachel Boland. All told, the insertion of the earplugs and the donning of the glasses takes seconds.

Employees who cut vinyl or glass should wear gloves. An extremely small population of production workers (those who work in the Foam Room) wear a full Tyvek suit to protect their clothes from foam and chemical spray. The employees who wear such a suit do not put it on until they are in the Foam Room itself, after they clock in for their shift. (Boland Dec. ¶ 11.)

### D. The Timeclocks are Centrally Located and *En Route* From the Employee Entrance to the Lines.

There are three electronic timeclocks at the Streetsboro facility. They are spaced along the central, wide aisle that bisects the facility and separates the production lines from the finished goods. A copy of a Safety Map is attached as Exhibit B to the Declaration of Rachel Boland. From the employee entrance near the cafeteria, it takes no more than a minute to walk to the nearest

timeclock and clock in. (Boland Dec. ¶ 12.)

Pursuant to Soft-Lite timekeeping practices, employees are permitted to clock in up to 15 minutes prior to the commencement of their shift. For example, McCall worked First Shift throughout his career. (Boland Dec. ¶ 13.) He could enter the facility and clock in as early as 5:45 a.m. without being penalized. At 6:00 a.m., the shift commences when a buzzer sounds. Conversely, at the end of a shift, the employees are given 15 minutes prior to the buzzer sounding to clean up their work area while they are still on the clock. (*Id.*)

Each department has a "huddle" at the beginning of the shift on the clock. During those huddles, the department manager or supervisor (depending on the line) will go through general instructions for the day, such as goals, issues with equipment, and maintenance reports. (Boland Dec. ¶ 15.) The huddles take place on the production floor in their respective departments and do not occur until <u>after</u> the buzzer sounds and the workers have punched in. (*Id.* ¶ 16.) There is no reason to have the huddle prior to the start of the shift, as employees can clock in up to the moment the buzzer sounds before going to the floor. It would therefore be counterproductive to hold the meeting prior to the shift start time. (*Id.* ¶ 17.)

> E. It is Effectively Impossible to Perform Assembly Line Work Prior to the Shift Start Time.

As noted above, Soft-Lite runs five separate lines. These lines are true assembly lines in the classic definition of the phrase: the product starts at the west end of the facility and moves from station to station eastward with each station modifying the product until it reaches the terminus. (Boland Dec. ¶ 18.) For example, McCall worked as a Wrapper on the "10-11 Line." That line had eight stations that preceded the Wrapper. Moving from west to east, they were:

| Saw | Punch Press/ Balancer | Weather Stripping | Welder | Cleaner | Hardware | Frame Setup | Glazer | Beader | Fitter | Wrapper |
|---|---|---|---|---|---|---|---|---|---|---|

As a Wrapper, McCall did precisely that: he would take the finished product and run it through a machine to literally "wrap" it with plastic for transport. Once wrapped, he would take the window

-5-

and place it onto a cart in the "Finished Products" area on the other side of the timeclock aisle. (*Id.*) Each position listed performed a specific duty on the window before it moved to the next station. If a station was not manned, or there was no product available, the stations further down the line (including McCall) would have nothing to do.

### III. ARGUMENT

Plaintiff's brief is five pages too long. Pursuant to Local Rule 7.1, memoranda relating to non-dispositive motions must not exceed fifteen pages. L.R. 7.1(f). Plaintiff never sought leave to file a twenty-page brief. The Court should, therefore, either strike plaintiff's memorandum in its entirety and have plaintiff refile with the correct page limit or, barring that, simply discount and not consider any argument contained in the final five pages. Even if the Court does consider any or all the brief as submitted, plaintiff fails to meet his burden at this stage.

#### A. The Court Should Defer its Certification Decision Until the Sixth Circuit Issues a Ruling in *Brooke v. A&L Home Care and Training Center*.

The Court should defer its decision on plaintiff's motion in light of serious issues with the "conditional certification" process, which are currently being reviewed by the Sixth Circuit in *Brooke Clark v. A&L Home Care and Training Center,* 22-3101 (6th Cir.). In that case, the Sixth Circuit will decide whether to continue to allow the decidedly plaintiff-friendly two-step certification process set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D.N.J. 1987) (predating *Twombly* and *Iqbal*), or if the district courts "should rigorously enforce [the similarity requirement] at the outset of the litigation" after a period of preliminary discovery as held in *Swales v. KLLM Transport Services, L.L.C.*, 985 F.3d 430, 443 (5th Cir. 2021). If the Sixth Circuit follows the lead of the Fifth Circuit in *Swales*, the "conditional certification" paradigm will change substantially. Instead, a district court will need to identify at the outset of the case what facts and legal considerations will be material in determining whether named plaintiffs are "similarly situated" and authorize preliminary discovery accordingly. *Swales*, 985 F.3d at 441.

The burdens of the proposed notice on the defendant are acute and the "real risk of abuse of the collective action device" describe by the Supreme Court and the Fifth Circuit is apparent. *Swales*, 985 F.3d at 436 (citing *Hoffman La Roche*, 493 U.S. at 169). Here, plaintiffs seek a class of all current and former manufacturing employees at Soft-Lite for the past three years—and have offered a total of <u>two</u> virtually identical, fact-deficient, conclusory declarations prepared by a husband and wife. Defendant should not be burdened with the disruption notice will cause when plaintiff has not attempted to meet even the <u>modest</u> factual showing required. The Court should deny the Motion for not meeting the similarly situated standards outlined below. But, if the Court is not inclined to deny the Motion, any decision on the Motion should be held in abeyance until the Sixth Circuit decides the *Brooke* case, which recently conducted oral argument on December 7, 2022.

### B. McCall's Request is Premature and the Court Should Delay Its Ruling Until the Parties Conduct Limited Discovery.

As described below, McCall has submitted nothing in support of his Motion except for four declarations composed of conclusory allegations without factual foundation. This is insufficient to justify conditional certification. As the Fifth Circuit noted in *Swales*:

> [A] district court should identify, *at the outset of the case*, what facts and legal considerations will be material to determining whether a group of "employees" is "similarly situated." And then it should authorize preliminary discovery accordingly. The amount of discovery necessary to make that determination must be made, and as early as possible. In other words, the district court, not the standards from *Lusardi*, should dictate the amount of discovery needed to determine *if and when* to send notice to potential opt-in plaintiffs.

*Swales*, 985 F.3d 440-41 (emphasis added).

For all of the reasons set forth below, McCall's class is inappropriate, but even if the Court is inclined to consider certification, the parties should first be permitted to conduct limited to determine whether McCall has claims that lend themselves to collective treatment in the first place. Indeed, defendant proposed such discovery to commence at the conclusion of the Rule 16

conference, but plaintiff refused to allow discovery until the Court's decision on certification. (Doc. 11.) The result of this stonewalling is the production of the four, virtually identical, conclusory declarations discussed below. Plaintiff should not be permitted to secure conditional certification and notice on such a scant showing.

There are numerous issues on the face of McCall and the other declarants' assertions. For example, all four declarations claim that the individuals were not paid for time spent "changing into and out of their personal protective equipment, including but not limited to safety glasses, masks, ear protection, and/or steel toed boots." (Doc. 15-3; Doc. 15-4). Pictures of the safety glasses, earplugs, and steel toed/boots are attached as Exhibit A to the Declaration of Rachel Boland. The time spent putting the glasses and earplugs on amounts to mere *seconds*. This is the definition of *de minimis*. Further, Soft-Lite does not require their employees to wear the boots when walking around the central aisle of the production floor where the timeclocks are located. Thus, McCall could punch in and then return to the locker area to put on his shoes before returning to the production floor. (Boland Dec. ¶ 10.)

Additionally, management had to speak with McCall on at least one occasion for repeatedly failing to be at his assigned work area during his shift. Indeed, McCall was well-known throughout the facility as the "Smoothie King" because he brought in a cooler full of home-made smoothies and sold them to his fellow employees throughout his shift. (Boland Dec. ¶ 4.) His entrepreneurial endeavors also included selling t-shirts to the other production workers. (*Id*.) Further, his own time records illustrate that he punched in *minutes* before his start time at 6:00 a.m. and in many cases, he punched out *before* his shift ended. *See* Exhibit C to the Declaration of Rachel Boland (Time Records). In short, there are significant questions regarding his blanket, conclusory statement that he "regularly worked over 40 hours per week." (Doc. 15-3.)

Additionally, there is the obvious question of how McCall and the other opt-ins can "perform[] manufacturing work" off-the-clock on an assembly line when such would require every

position to be staffed up and down the line prior to shift start and after shift end. These issues confirm that discovery must be conducted before the certification question can be appropriately addressed. *See Neff v. U.S. Xpress, Inc.,* No. 2:10-CV-00948, 2013 WL 1131070 (S.D. Ohio Mar. 18, 2013), report and recommendation adopted, No. 2:10-CV-948, 2013 WL 4479078 (S.D. Ohio Aug. 20, 2013) (allowing three months of specifically tailored collective action discovery prior to conditional certification); *see also Fenn v. Hewlett-Packard Co.*, No. 1:11–CV–00244–BLW, 2011 WL 6150642 (D. Idaho, Dec. 12, 2011) (denying motion for conditional certification without prejudice and permitting parties to take limited discovery regarding issues of certification). Indeed, without requiring more of McCall, issuing notice of the instant matter will do nothing more than "stir[] up litigation" by "alerting those who cannot ultimately participate in the collective." *Swales*, 985 F.3d at 441.

### C. If the Court Does Not Defer its Decision, It Should Evaluate Plaintiff's Motion with the Requisite Caution.

Considering the flaws in their substantive arguments (discussed fully below), it is no surprise that plaintiffs spend the lion's share of their motion arguing that their procedural burden at this stage is a mere formality, and that conditional certification is inevitable. But contrary to plaintiffs' suggestion, conditional certification <u>does not</u> automatically follow from the mere filing of a § 16(b) action. Section 16(b) permits employees to seek relief for FLSA violations "for and on behalf of . . . themselves and other employees similarly situated." 29 U.S.C. § 216(b). A collective action is not an entitlement under the FLSA, however, and courts must decide on a case-by-case basis whether to certify a notice class—a power that must "be authorized with discretion and only in appropriate cases." *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1233 (M.D. Ala. 2003). *See also Triggs v. Lowe's Home Centers, Inc.*, No. 1:13 CV 1897, 2014 WL 4162203, at *4 (N.D. Ohio Aug. 19, 2014) (Gaughan, J.) (denying conditional certification because evidence was "insufficient to demonstrate that there [was] substantial similarity among the

proposed opt-in plaintiffs").

In the first stage, courts must determine "whether the plaintiff has shown that the class of employees he seeks to represent are 'similarly situated.'" *Bradford v. Team Pizza, Inc.*, No. 1:20-CV-60, 2020 WL 3496150, at *1 (S.D. Ohio June 29, 2020), *report and recommendation adopted*, No. 1:20-CV-00060, 2020 WL 5987840 (S.D. Ohio Oct. 9, 2020). To do so, a plaintiff "must demonstrate a factual nexus—that is, something more than 'bare allegations'—to warrant conditional certification." *O'Neal v. Emery Fed. Credit Union*, No. 1:13CV22, 2014 WL 6810689, at *5 (S.D. Ohio Dec. 3, 2014) (quotation omitted). Courts require a "modest factual showing" that the plaintiff and the putative plaintiffs are similarly situated and that their claims "[are] unified by common theories of defendants' statutory violations." *Comer v. Wal–Mart Stores, Inc.*, 454 F.3d 544, 546–47 (6th Cir.2006). A court should exercise some caution "because the Sixth Circuit has held 'that a conditional order approving notice to prospective co-plaintiffs in a suit under § 216(b) is not appealable.'" *Albright v. Gen.Die Casters, Inc.*, 5:10-CV-480, 2010 WL 6121689, *3 (N.D. Ohio July 14, 2010) (citing *Comer*, 454 F.3d at 549). Plaintiff's burden is "more than a mere formality." *Shell v. Pie Kingz, LLC*, 415 F. Supp. 3d 769, 772 (N.D. Ohio 2019). "Further, the factual assertions of both parties must be considered at this stage." *Id*. Here, plaintiff has fallen significantly short of his burden.

### D. Admissible Evidence—Not Conclusory Allegations—Must Support Plaintiff's Motion.

"Axiomatically, allegations do not meet the definition of a 'showing.'" *Tyler v. Taco Bell Corp.*, No. 15-2084, 2016 WL 3162145, at *4 (W.D. Tenn. June 3, 2016) (McCalla, J.). In this Circuit, courts repeatedly find that conclusory declarations asserting that other employees are similarly situated are insufficient to support conditional certification. *Neff v. U.S. Xpress, Inc.*, No. 2:10-CV-00948, 2013 WL 1131070, at *5 (S.D. Ohio Mar. 18, 2013), *report and recommendation adopted*, No. 2:10-CV-948, 2013 WL 4479078 (S.D. Ohio Aug. 20, 2013) (denying conditional

certification of larger class sought by plaintiff because "[p]laintiff's affidavits do little more than recite the allegations in the complaint" and contained "no facts backing up the asserted legal conclusions"); *Wade v. Werner Trucking Co.*, No. 10-270, 2012 WL 5378311, at *6 (S.D. Ohio Oct. 31, 2012) (concluding that the affidavits did not establish that putative collective members were similarly-situated and noting that the "affiants offer, in conclusory fashion, that they performed the same or similar job duties" without providing "any detail regarding the employees' actual job duties").

Instead, at a minimum, plaintiff must "at least allege *facts* sufficient to support an inference that [he has] *actual knowledge* about other employees['] job duties, pay structures, hours worked, and whether they were paid for overtime hours." *O'Neal*, 2013 WL 4013167, at *5 (emphasis added); *Cox v. Entm't U.S.A. of Cleveland, Inc.*, No. 13-2656, 2014 WL 4302535, at *3 (N.D. Ohio Aug. 29, 2014) (denying conditional certification because the plaintiff had no direct knowledge of the procedures actually followed by potential class members).

The only "factual" support that plaintiff provides in support of his Motion are declarations from the four opt-ins—three of which are identical and all of which contain unsupported conjecture and legal conclusions. For example:

| **Declaration Testimony** | **Issues** |
| --- | --- |
| "During my employment, I observed other manufacturing employees, who had substantially similar job duties as me, also performing the following work before and after their scheduled start and stop times…" (Doc. 15-3; 15-4.) | No detail provided regarding which "other manufacturing employees" were observed or when they were observed and performing which duties off-the-clock. In addition, the comment that they were performing "substantially similar" duties is an improper legal conclusion. |
| "Through conversations with other non-exempt manufacturing employees, who had substantially similar job duties as me, I believe that Defendant also did not pay these employees for performing the following work before and after their scheduled start and stop | Again, the use of "substantially similar" is a legal conclusion. Further, no detail is provided regarding with whom and when these conversations occurred, what line they worked on, their responsibilities, their shift time, their |

| | |
|---|---|
| times…" (Doc. 15-3; 15-4.) | supervisors, or any relevant detail. |

This Court has previously found such cookie-cutter declarations to be insufficient to justify conditional certification. In *Miner v. Newman Tech., Inc.*, No. 1:21-CV-00694, 2021 WL 3652277, at *6 (N.D. Ohio Aug. 18, 2021)[1], the Court denied conditional certification where plaintiff relied on conclusory declaration statements that were not based on personal knowledge, failed to detail plaintiffs' job duties, failed to explain how the alleged uncompensated activities were integral and indispensable to their positions, and were virtually identical.

As McCall has done here, the plaintiff in *Miner* submitted her own declaration in support of conditional certification declaring "that she was a 'non-exempt manufacturing employee' and that she was not paid for work performed outside her scheduled shift start and stop times, including changing into and out of personal protective equipment, getting tools and equipment, walking to her assigned area of the manufacturing floor, and performing her manufacturing work." *Id.* at *2. She also submitted declarations from three other employees, who held disparate job positions, that were "virtually identical," which simply "mirror[ed] Plaintiff's declaration in that they claim Defendant required them to do unpaid work, including changing into and out of their PPE, walking to their assigned areas of the manufacturing floor, and performing manufacturing work." *Id.* Aside from the generic recitations regarding not being compensated for donning and doffing protective gear and conclusory statements about that activity's "integral and indispensable" nature, "neither Plaintiff nor the declarants describe their job duties or explain how donning and doffing their protective equipment is integral and indispensable to their jobs." *Id.* at *4. The court found that where "Plaintiff and the declarants supporting her motion provide their job titles and declare they are required to wear PPE… they do not provide evidence that would permit the Court to determine

---

[1] The plaintiff in *Miner* was represented by plaintiff's counsel in this case.

whether they are similarly situated to one another and whether the required donning and doffing is integral and indispensable to their duties." *Id.* at *5.

Similarly, the Court found that "at this stage, Plaintiff's only proof of [a single, FLSA-violating policy] is the nearly identical declarations of two other employees with different job titles stating that 'as a result of Newman Technology's practices and policies, I was not compensated for all of the time I worked, including all of the overtime hours I worked over 40 each workweek.' These conclusory statements are not sufficient evidence of a company-wide policy of requiring employees to perform unpaid work." *Id.* at *6; *see also Gaffers v. Sitel Worldwide Corp.*, No. 16-0128, 2016 WL 3137726 (M.D. Tenn. June 6, 2016) (finding that conclusory declarations asserting that other employees are similarly situated were insufficient to support conditional certification particularly where plaintiff's allegations must be based on his own personal knowledge).

The Court now faces a virtually identical situation. Here, the plaintiff and three opt-ins have personal knowledge over <u>only</u> their own situations. They contain only conclusory assertions about not being paid for performing certain activities outside the scheduled shift start and stop times. Plaintiff also submitted declarations from opt-ins that are virtually identical and mirror the conclusory allegations contained in his own declaration. And, like the *Miner* declarations, the declarations here do nothing to describe each declarant's job duties or explain how the activities for which they allege they were not paid were integral and indispensable to their duties, considering an explanation of those duties is entirely absent.

Finally, the Court cannot overlook the differences between named plaintiff McCall and the other opt-in declarations on critical issues, such the amount of time spent working:

| **Jimmie McCall Declaration** | **Other Opt-in Declarations** |
|---|---|
| "Defendant required me to ensure that my work area was up and running by my scheduled shift start time, be in the manufacturing area during my scheduled shift, and wear personal protective equipment during | No discussion of having work area up and running by scheduled shift start time or any reference to being in the manufacturing area during their shifts. |

-13-

| | |
|---|---|
| my scheduled shift. To do so, I had to perform work prior to my scheduled shift start time and/or perform work after my scheduled shift end time." (Doc. 15-3; 15-4.) | The only "unpaid work" that the other Opt-ins claim they were required to perform before and after their scheduled shifts was changing into PPE. (Doc. 15-4.) |
| "I regularly worked over 40 hours per week." (Doc. 15-3.) | No mention of how many hours per week the others worked. |

These differences among the already scant declaration testimony further affirm that these individuals are not similarly situated for conditional certification purposes.

### E. Plaintiff's Proposed Notice Presents Numerous Problems.

The proposed notice attached to plaintiff's Motion (Dk. 15-5) is deficient and overreaching in several respects. To the extent notice is required, and defendant does not believe it is for all of the reasons described above, defendant has attached an alternate, revised version that adheres to the requirements under the law, as well as the facts illustrated in this litigation. *See* Exhibit 2 (Revised Notice and Redline). At a minimum, the revised notice contains a balanced account of the claims and defenses set forth by both parties, rather than the current, plaintiff-biased account.

First, the scope of the notice is overbroad. McCall and the other three opt-ins have not provided sufficient detail to justify any certification beyond their very limited positions, if that. The notice, if it is sent at all, therefore, should be limited to those particular job classifications. Soft-Lite also objects to the inclusion of a three-year statute of limitations within the notice, as plaintiff has provided no evidence that any violation was, in fact, willful.

Soft-Life also objects to the issuance of the notice via text message. Not only would this be an invasion of privacy, but plaintiff has also failed to demonstrate any compelling need to issue notice via text. This Court has previously denied similar requests. *See Green v. Verita Telecommunications Corp.*, No. 1:20 CV 2872, 2021 WL 2227379 (N.D. Ohio June 2, 2021) (denying request for notice via text, noting "plaintiff wholly fails to provide any argument as to why notice via text is required here"); *see also Kopp v. Precision Broadband Installations, Inc.*, No. 3:20 CV 2779, 2021 WL 2688520 (N.D. Ohio June 30, 2021) (refusing to order notice by text

or email; "District Courts in Ohio generally approve a single method of notification unless there is reason to believe that method will be ineffective."); *See also Young v. Hobbs Trucking Co.*, 2016 WL 3079027, at *3 (M.D. Tenn. June 1, 2016) ("Mr. Young has offered no evidence—and made no argument—suggesting that a mailed notice is insufficient to notify all putative class members of their right to opt in to this action…"); *Lindberg v. UHS of Lakeside, LLC,* 761 F. Supp. 752, 765 (W.D. Tenn. 2011) ("first-class mail is generally considered to be 'best notice practicable' to ensure that proper notice is received by potential class members").

There is also no reason to issue the notice via email as Soft-Lite does not require its employees to disclose personal email addresses. (Boland Dec. ¶ 20.) Thus, the request is not only unnecessary and burdensome, but would reach far fewer employees than ordinary mail.

Further, the notice must include and describe the discovery obligations for any individual who elects to opt-into the lawsuit. It is critical that all future plaintiffs be made aware of their responsibilities, including providing documents and potentially sitting for deposition.

Finally, the entire class listing should not be provided to plaintiffs' counsel. Rather, at their choice, the notices should be sent either: a) by an administrator who is qualified to efficiently handle and deal with issues such as bad addresses or questions involving the lawsuit; or b) by Soft-Lite itself.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's Motion for Conditional Certification, Expedited Opt-In Discovery, and Court-Supervised Notice to Potential Opt-In Plaintiffs should be denied.

        Respectfully submitted,

        /s/ *Jeffrey R. Vlasek*

        Gregory V. Mersol (0030838)
        Jeffrey R. Vlasek (0082771)
        Carrie A. Valdez (0094004)
        **BAKER & HOSTETLER LLP**
        Key Tower
        127 Public Square, Suite 2000
        Cleveland, OH 44114-3485
        Telephone: (216) 621-0200
        Facsimile: (216) 696-0740
        gmersol@bakerlaw.com
        jvlasek@bakerlaw.com
        cvaldez@bakerlaw.com

        *Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

 I hereby certify that on December 16, 2022, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the ECF system.

              /s/ *Jeffrey R. Vlasek*
              Attorney for Defendants